**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| KOLMAR AMERICAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERCONTINENTAL TERMINALS | ) | Civil Action No.: _____ |
| COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Kolmar Americas, Inc. ("Kolmar") files this Complaint against Defendant Intercontinental Terminals Company, LLC ("ITC"), and, upon knowledge, information, and belief, alleges as follows:

## INTRODUCTION

1.      On March 17, 2019, a fire occurred at an onshore terminaling service facility (as such terms are defined under 33 U.S.C. § 2701(9) and (24)) owned and operated by ITC, located at 1943 Independence Parkway South in La Porte, Texas 77571, also referred to as "Deer Park" ("Onshore Facility"). The fire caused a series of occurrences that resulted in a discharge and substantially threatened to result in a discharge ("Discharge," as such term is defined under 33 U.S.C. § 2701(7)) of oil ("Oil," as such term is defined under 33 U.S.C. § 2701(23)) to the Houston Ship Channel (the "HSC") (referred to herein as the "Incident," as such term is defined under 33 U.S.C. § 2701(14)).

2.     As a result of the Incident, on March 22, 2019, there was a Discharge and the substantial threat of a Discharge of Oil from the ITC Onshore Facility entered into the HSC, a navigable water of the United States, and surrounding waters, which directly caused the subsequent closure of the HSC in order to contain the spread of Oil and allow for response, remediation and removal (as that term is defined under 33 U.S.C. § 2701(30)).

3.     ITC is the responsible party ("Responsible Party," as that term is defined under 33 U.S.C. § 2701(32)(B)) for the Incident and the source of the Discharge and the substantial threat of a Discharge of Oil that caused Damages to Kolmar.

4.     Kolmar has suffered economic loss, incurred additional expenses, and experienced other damages as a result of the Incident ("Damages," as that term is defined under 33 U.S.C. § 2701(5), and as specified in 33 U.S.C. § 2702(b)). Kolmar has suffered Damages, including lost revenues, profits and/or impairment of earning capacity as a result of the Incident.

## PARTIES

5.     Plaintiff Kolmar is a Delaware corporation with its principal place of business located at 10 Middle Street, PH, Bridgeport, Connecticut 06604.

6.     Defendant ITC is a Delaware limited liability company with its principal place of business located at 1943 Independence Parkway, LaPorte, Texas 77571.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claim asserted herein arises under the laws of the United States. Kolmar seeks recovery of Damages under the Oil Pollution Act (33 U.S.C. § 2701 *et. seq.*) (the "OPA").

8. This Court also has jurisdiction over this action pursuant to the OPA, 33 U.S.C. § 2717(b).

9. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1333 because this action is an admiralty action and maritime claim within the meaning of Federal Rule of Civil Procedure 9(h).

10. This Court has personal jurisdiction over ITC because ITC is registered to do business in Texas, does business in Texas, and has a registered agent in Texas.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

12. Kolmar is in the business of sourcing and marketing petroleum, petrochemical products, biodiesel, and other renewable fuels. Kolmar purchases and sells the foregoing products to third parties, receives purchased product at storage terminals, stores those products for future sales, and transports those products via barge, vessel, and rail. Kolmar conducts the foregoing operations throughout the Gulf Coast.

13. ITC is in the business of providing storage and terminaling services. ITC owns and operates the Onshore Facility—a storage and terminaling services facility. ITC operates the Onshore Facility as an independent for-hire terminal that receives, stores, and transfers oil and related petroleum products owned by external customers.

14. Upon information and belief, the Onshore Facility is situated on approximately 265 acres on the HSC, a navigable water of the United States, and consists of approximately 242 tanks that store Oil.

15.     Kolmar and ITC entered into an agreement for storage and terminaling services, effective September 29, 2009, with a reference number of 1092, as amended by four amendments ("Agreement 1092").

16.     Additionally, Kolmar and ITC entered into an agreement for storage and terminaling services, effective September 29, 2009, with a reference number of 1093, as amended by three amendments ("Agreement 1093").

17.     Pursuant to Agreement 1092 and Agreement 1093 (Agreement 1092 and Agreement 1093 are collectively referred to as the "Agreements"), ITC was obligated to render storage and terminaling services to Kolmar. The ability to use ITC's terminaling services to move petroleum products to and from third parties was an essential component of the Agreements and critical to Kolmar's business. At the time of the Incident, Kolmar leased seven tanks from ITC, which tanks ranged in storage capacity from 80,000 to 160,000 barrels.

**A.     *The Incident***

18.     On March 17, 2019, an Oil storage tank at the Onshore Facility caught fire, which subsequently spread to adjacent tanks. On information and belief, the fire was caused by a leak in a pipe in a tank containing Oil.

19.     Between March 17, 2019 to March 22, 2019, multiple fire outbreaks at a tank farm at the Onshore Facility resulted in the substantial threat of a Discharge of Oil into navigable waters of the United States as well as the collection of Oil, firefighting foam and wastewater in a secondary containment area.

20.     The affected ITC tank farm at the Onshore Facility consisted of fifteen 80,000-barrel capacity, above ground storage tanks containing Oil including: naphtha, xylene, toluene, pyrolosis gas (pygas), gasoline blendstock, and base oil. All fifteen tanks in the tank farm were

-4-

impacted by the fire and ten of the tanks collapsed, or partly collapsed, presenting a substantial threat of a Discharge of Oil.

21.     On the morning of Friday, March 22, 2019, a containment dike surrounding the tank farm's secondary containment area at the Onshore Facility was breached. This breach allowed Oil located within the containment dike to be Discharged into the surrounding navigable waters of the United States, including Tucker's Bayou and Buffalo Bayou.

22.     At 12:37 p.m. on the same day, the United States Coast Guard ("USCG") Sector Houston-Galveston Vessel Traffic Service broadcast the prohibition of all vessel movements on the HSC from Tucker's Bayou to the HSC Light 116 due to the Incident. Additionally, as of 6:03 p.m. on March 22, 2019, the USCG Captain of the Port called for the stoppage of all cargo operations in the HSC from the Cargill Facility East Terminal to the Cemex USA Terminal, which is the area between HSC Light 139 and Light 129.

23.     The HSC and multiple related waterways remained closed and/or subject to major restrictions, such as daylight restrictions and one-way traffic, until April 13, 2019, at the earliest.

24.     As of June 19, 2019, ITC was still addressing the failure of the secondary containment area as there was an accumulation of residual Oil and other materials in several ditches and pathways that either continued to cause a Discharge of Oil to navigable waters of the United States or present a substantial threat of a Discharge of Oil.

25.     Because the Incident occurred at an Onshore Facility, the Environmental Protection Agency ("EPA") was the On-Scene Coordinator ("OSC") responsible for monitoring and directing responses to the Incident as well as the coordination of all federal efforts with local and state authorities.

26.     On March 23, 2019, EPA Region 6 issued an order ("EPA Order") under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1321 (c), (e), and (m), for the discharge of pollutants, including toluene, benzene, xylene, naphthalene, ethylbenzene, and styrene into the HSC.

27.     The Declaration of Adam Adams, the OSC for the Incident, included with the EPA Order, states that the EPA took aerial photographs of the HSC and that two such photographs depict "a sheen flowing from the ITC facility and into Tucker Bayou and the Houston Ship Channel, also known as Buffalo Bayou." Mr. Adams also states that he personally observed "a sheen and foamy, chemical-looking substance on the surface of the Houston Ship Channel in the same area depicted in the photographs."

28.     The EPA Order requires ITC to "remove the remaining material in secondary containment including oil" and "[r]emove the spilled material, including oil."

29.     The EPA Order reserved EPA's right to take additional enforcement actions, which included the future performance of additional activities pursuant to OPA.

30.     The Texas Commission on Environmental Quality ("TCEQ"), the Texas Parks and Wildlife Department ("TPWD"), the Texas General Land Office ("GLO"), the National Oceanic and Atmospheric Administration ("NOAA"), and the U.S. Department of the Interior ("DOI") (collectively, the "Trustees") have authority to perform a natural resource damage assessment ("NRDA") related to the Incident. On August 5, 2019, the Trustees issued a Notice of Intent to Perform an NRDA ("NRDA Notice"), which states that the Incident was a release of hazardous substances, oil, and other chemicals. The NRDA Notice additionally states "Natural resources for which the [Trustees] may assert trustee authority under CERCLA and OPA have been, or likely have been, adversely affected by the release. . . ."

**B.**     *Harm to Kolmar as a Result of the Incident*

31.     Due to the Incident and the direct effects flowing from the Incident—the HSC closure, related USGC vessel traffic commands, and the loss of access to the Onshore Facility and surrounding terminaling facilities—Kolmar experienced Damages under the OPA, including economic losses, additional fees, costs and expenses, lost revenues, profits and opportunities, and suffered other Damages that it would not have experienced but for the Incident. These Damages consist of three primary categories, characterized as follows:

       (a)     Impairment of earning capacity and lost profits due to added costs and expenses, including fines, taxes, and assessed costs, and leased tank rentals (33 U.S. Code § 2702(b)(2)(E)).

       (b)     Lost profits and injury to or economic losses resulting from the inability to access leased property (33 U.S. Code § 2702(b)(2)(E)).

       (c)     Impairment of earning capacity and lost profits, due to lost revenues, profits, and opportunities (33 U.S. Code § 2702(b)(2)(E)).

32.     Kolmar experienced the following specific Damages in the form of impairment of earning capacity and lost profits due to added costs and expenses under the OPA, 33 U.S. Code § 2702(b)(2)(E), as a result of the Incident:

       (a)     As a result of the Incident and the HSC closure, Kolmar incurred lost profits in the form of demurrage costs. Kolmar's vessels and barges—chartered from third-party providers for marine cargo operations—were prohibited by USCG commands from entering, exiting, and otherwise transiting the HSC and adjacent waterways, which resulted in the demurrage. Indeed, numerous of Kolmar's vessels and barges incurred demurrage costs beginning March 22, 2019 until at least May 6, 2019. Kolmar took steps to mitigate its Damages due to stranded vessels and barges and incurred additional costs to mitigate such losses. Such mitigation efforts included redirecting vessels away from the HSC to facilities far up the Mississippi River

near Baton Rouge, Louisiana in order to unload their cargo and avoid further demurrage. This harm resulted in at least $2,325,807.73 of Damages resulting in economic loss that Kolmar would not have experienced but for the Incident.

(b)      As a result of the Incident and the HSC closure, Kolmar incurred the lost profits in the form of additional levied taxes. As a result of the HSC closure and Incident-related USCG commands, Kolmar's product was stranded at the Onshore Facility that Kolmar would have otherwise removed from the State of Texas but for the Incident, since that product is subject to a prohibitive inventory tax levied by Harris County. Directly as a consequence of the Incident-related harbor closure, linked USGC commands, and Kolmar's related inability to transport its product, Harris County levied at least $372,452.00 on Kolmar's immovable product.

(c)      The Incident's closure of the HSC directly caused physical inaccessibility to the Onshore Facility and Kolmar's leased tanks within the Onshore Facility. Kolmar had product in railcars that arrived at the Onshore Facility prior to and shortly following the Incident, and Kolmar was unable to unload the product from those railcars and into those leased tanks. This harm resulted in at least $88,039.36 in lost profits railcar demurrage.

(d)      As a result of the Incident, Kolmar was forced to mitigate its Damages by utilizing other tanks leased from other storage operators to prevent additional product from becoming paralyzed. Specifically, Kolmar diverted vessels bound for the Houston area to storage facilities located on the Mississippi River in order to avoid extensive delays and additional demurrage costs due to the closure of the HSC and the inability to access tanks previously planned for unloading. As a result, Kolmar had to convert these tanks located on the Mississippi River from benzene to pygas storage in order to accommodate product that Kolmar had a contractual obligation to purchase from third parties prior to the Incident. Kolmar incurred

significant costs to remove benzene from those substitute tanks to make them suitable for pygas storage. Additionally, Kolmar will incur significant costs to clean the tanks that now contain the pygas, a dirty product, to return those tanks to a state where they may hold, and not contaminate, benzene, which is a clean product. This harm will result in at least $660,400.00 in lost profits Damages.

33.    Kolmar experienced the following Damages in the form of lost profits and losses resulting from the inability to access leased property (33 U.S. Code § 2702(b)(2)(E)).

(a)    The Incident prohibited Kolmar from physically reaching and utilizing the storage tanks that Kolmar leased from ITC at the Onshore Facility and another storage and terminaling services provider, Vopak Terminal Deer Park Inc. ("Vopak Facility"), directly as a result of the closure and/or limited accessibility of the HSC pursuant to mandatory USCG commands related to the Incident.  Utilization of the leased tanks at the Onshore Facility and the Vopak Facility is an integral part of Kolmar's business. In addition to the Onshore Facility, Kolmar also stores product it receives from third parties in the Vopak Facility tanks and delivers product to third parties or holds product in the tanks to take advantage of, or protect itself from, fluctuating market prices—a common practice in the oil commodity business. When Kolmar was denied such opportunities as a direct result of ITC's Incident, it was unable to realize the benefit of its contract with both Vopak Facility and the Onshore Facility and the cost to lease tanks in each facility became a loss. The cost of the leases for both the Onshore Facility and the Vopak Facility became a total loss, because zero benefit could be derived from the lease. This harm resulted in at least $1,299,357.56 in lost profits Damages.

34.    Kolmar experienced the following Damages in the form of lost revenues, earnings, and opportunities under the OPA, 33 U.S. Code § 2702(b)(2)(E), as a result of the Incident.

(a)     As a result of the Incident and inaccessibility of the Onshore Facility, Kolmar was no longer able to receive deliveries of product into the tanks leased from ITC that it was contractually obligated to receive, causing significant delay in delivery. This harm resulted in at least $56,700.00 in lost earnings and profits Damages.

(b)     The inaccessibility of the Onshore Facility additionally prohibited Kolmar from loading product out of its tanks at the Onshore Facility by barge and vessel. Because Kolmar's tanks were unreachable, the product contained within them could not be utilized. Thus, the Incident caused Kolmar to lose opportunities to make various purchases and sales, resulting in at least $1,239,000.00 of lost earnings and profits that Kolmar was prevented from realizing.

(c)     Kolmar also suffered financing costs of at least $406,258.18 due to the Incident and the inaccessibility of the Onshore Facility per USGC commands. Per common business practices for a marketing company, Kolmar regularly finances the cost of the product it holds in inventory while it waits to make a sale of that product to a third party. Without the ability to access and sell that product, Kolmar was forced to continue to pay financing costs on immovable product for a considerably longer period than it would have but for the Incident.

(d)     Kolmar also experienced losses because certain product markets were in backwardation prior to the Incident, a market condition where the price of a commodity's forward contract is trading below the expected price. From the date of the Incident to the present date, Kolmar still does not have access to certain tanks leased from ITC and the product is stranded. When Kolmar could not sell the product that was hedged by financial futures contracts, Kolmar was then required to sell those futures contracts in a particular month at expiry and then purchase additional futures contracts for the next month at lower pricing. The failure to close out of these future positions prior to expiry would have triggered an

-10-

obligation of Kolmar under the rules of the relevant futures exchange to sell physical product to a buyer that held a long futures position past expiry. As a result of the foregoing and as a result of the markets in backwardation, Kolmar experienced losses of at least $1,273,968.00.

35.     Kolmar suffered a total of at least $7,721,982.83 in economic Damages as a result of the Incident.

36.     The negative economic effect of the Incident reverberated for weeks and months following the date of the Incident, and even as of the date of this Complaint, Kolmar continues to experience Damages in the form of economic losses and ongoing additional expenses directly as a result of the Incident.

37.     Kolmar made "presentment" of a Claim in accord with 33 U.S.C. §§ 2702(b) and 2713, by submitting a description of the claim in the amount of at least $7,721,982.83 and supporting documentation to ITC on or about May 24, 2019. As of the date of this Complaint, ITC has not responded to Kolmar regarding the Claim.

## COUNT I
### (*The Oil Pollution Act*)

38.     Kolmar hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully restated here.

39.     The OPA imposes liability upon a "responsible party for a . . . vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702(a).

40.     The OPA defines Oil to mean "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a hazardous

substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) and which is subject to the provisions of that Act [42 U.S.C. 9601 *et seq*.]." 33 U.S.C. § 2701(23).

41.     The OPA imposes liability upon a Responsibility Party for an Incident, meaning "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

42.     The fire, collapse of Oil-containing tanks, and subsequent resulting breach of the second containment area constitute a series of occurrences that caused a Discharge and the substantial threat of a Discharge of Oil to the HSC falling within the defined meaning of "Incident" under the OPA.

43.     ITC is strictly liable as the Responsible Party for all the damages resulting from the Incident pursuant to Sections 2701 and 2702 of the OPA.

44.     ITC is not entitled to limit its liability under Section 2704(a) of the OPA because the Incident was proximately caused by its gross negligence, willful misconduct, and/or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

45.     As a result of the Incident, Kolmar is entitled to recover Damages pursuant to Section 2702(b)(2)(E), which provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

46.     As a result of the Incident, Kolmar incurred Damages in the amount of at least $7,721,982.83 in loss of profits or earning capacity impairment.

## PRAYER FOR RELIEF

WHEREFORE, Kolmar demands judgment against ITC, providing the following relief:

(1)        Economic and compensatory damages in amounts to be determined at trial;

(2)        Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(3)        Attorneys' fees, expert fees, and expenses;

(4)        A trial by jury; and

(5)        Such other and further relief available and any relief that the Court may deem just and proper.

September 24, 2019        Respectfully submitted,

By:    /s/ Jack Thomas
John N. Thomas
Attorney-In-Charge
875 Third Avenue
New York, New York 10022
Tel: (212) 704-6102
Fax: (212) 704-6288
Jack.Thomas@troutman.com

OF COUNSEL:

Leslie A. Davis
TROUTMAN SANDERS LLP
875 Third Avenue
New York, New York 10022
Tel: (212) 704-6102
Fax: (212) 704-6288
Leslie.Davis@troutman.com

Molly DiRago
1 N. Wacker Dr.
Chicago, Illinois 60606
Tel: (312) 759-1926
Fax: (312) 759-1939
Molly.DiRago@troutman.com

-13-

Juan C. Garcia
Texas Bar No.: 24045914
Federal I.D. No.: 574941
Daniel Johnson
Texas Bar No.: 24046165
Federal I.D. No.: 645939

JOHNSON GARCIA LLP
7324 Southwest Freeway, Suite 545
Houston, Texas 77074
Tel: 832-844-6700
Fax: 832-844-6868
juan@johnsongarcialaw.com
daniel@johnsongarcialaw.com

*Attorneys for Plaintiff Kolmar*
*Americas, Inc.*